(No. 52573.—

FREEMAN UNITED COAL MINING COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Allen Horn, Appellee).

*Opinion filed July 18, 1980.—Rehearing denied September 26, 1980.*

336

CLARK, J., dissenting.

Carter Harrison and Elmer Jenkins, of Benton, for appellant.

Lindholm & Williamson, of Peoria (Harold G. Lindholm and Nile J. Williamson, of counsel), for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

The claimant, Allen Horn, filed an application for adjustment of claim under the Workmen's Compensation Act (Ill. Rev. Stat. 1971, ch. 48, par. 138.1 *et seq.*) with the Industrial Commission on April 6, 1973, for injuries suffered as the result of an accident on December 23, 1971, in the course of his employment with the respondent, Freeman United Coal Mining Company. While the proceedings before the arbitrator were not made a part of this appeal, it appears from representations made by counsel for the respondent that the accident consisted of a cave-in at a mine in which Horn was working, and that his injuries included multiple fractures of the pelvis and serious injuries to one leg. Following the accident Horn never returned to work with the respondent or elsewhere.

On April 29 the arbitrator rendered a decision finding that Horn was permanently and totally disabled, and awarded him a lifetime pension. Horn's award also included a sum for all medical and hospital services incurred up to that time. The record does not indicate that any administrative or judicial review was taken of the award, and its propriety is not an issue in this proceeding.

In 1978 Horn filed a petition under section 8(a) of the Act (Ill. Rev. Stat. 1971, ch. 48, par. 138.8(a)) requesting that the respondent be ordered to pay unpaid bills aggregating some $5,500, covering various additional medical and hospital services rendered following the award, for conditions he alleged to be the product of the original injury. After a hearing the Commission issued an order that the payments be made, and its decision was confirmed by the circuit court for Franklin County. The respondent has appealed to this court under Rule 302(a)(2). 73 Ill. 2d

R. 302(a)(2).

In 1971, when the accident occurred, section 8(a) provided in pertinent part:

"The employer shall provide the necessary first aid medical and surgical services, and all necessary medical, surgical and hospital services thereafter, limited, however, to that which is reasonably required to cure or relieve from the effects of the accidental injury.

The employee may elect to secure his own physician, surgeon and hospital services at his own expense." (Ill. Rev. Stat. 1971, ch. 48, par. 138.8(a).)

Effective July 1, 1975, section 8(a) was amended to make the provisions quoted above read as follows:

"The employer shall provide and pay for all the necessary first aid, medical and surgical services, and all necessary medical, surgical and hospital services thereafter incurred, limited, however, to that which is reasonably required to cure or relieve from the effects of the accidental injury. ***

The employee may at any time elect to secure his own physician, surgeon and hospital services at the employer's expense ***." Ill. Rev. Stat. 1975, ch. 48, par. 138.8(a).

It was held in *Health & Hospitals Governing Com. v. Industrial Com.* (1978), 72 Ill. 2d 263, that the 1975 amendment is not applicable to claims arising from an accident occurring prior to that date, and the parties concede that it therefore does not apply here.

Horn's evidence in support of his petition consisted of his own testimony and of five exhibits, four of which were the hospital bills which he sought to have paid by the respondent. The admission of each of these was objected to by the respondent on various grounds. The fifth exhibit was a report by a Dr. George E. Roulhac of an office examination of Horn made on March 17, 1978. This exhibit was admitted without objection. Counsel for the respondent conducted no cross-examination of Horn.

The respondent's case consisted of an evidence deposition by Dr. John G. Gregory, which was introduced by agreement, and the testimony of Harry A. Treadwell, who

had been the respondent's manager of workmen's compensation since 1970 and was acquainted with Horn's case. Treadwell testified that under the respondent's claims procedure all bills for medical and hospital services had to be submitted to him for approval before being paid.

In 1977 Horn consulted Dr. Palagiri of Carbondale regarding a malfunction of his bladder. Dr. Palagiri treated Horn for this condition and succeeded in remedying it. According to Treadwell, Dr. Palagiri submitted a bill to the respondent which Treadwell approved for payment. The bill itself is not included in the record, and Treadwell did not testify as to the date when he received it. When asked whether he believed that the bladder condition was related to the particular injury for which Horn had been awarded compensation, the witness replied that he did, "since Horn had had multiple fractures of the pelvis in that area."

Apparently as the result of complaints by Horn of impotence, Dr. Palagiri referred him to Dr. Kenneth Smith of St. Louis, a neurologist. Dr. Smith in turn referred Horn to Dr. John G. Gregory, a urologist, who examined Horn on March 28, 1977. Both in the consultation with Dr. Smith and in that with Dr. Gregory, according to the latter, Horn registered complaints of his impotence. Upon learning of Horn's earlier consultations with Dr. Palagiri, Dr. Gregory secured from the latter his records of the diagnosis and treatment of Horn's bladder problem.

Horn was admitted to a St. Louis hospital on April 11, 1977, where Dr. Gregory implanted a prosthetic device to correct the impotence. Horn was discharged on April 21. Both Dr. Gregory and Horn himself testified that the surgery had corrected Horn's condition. Two of the bills introduced in evidence relate to the professional services of Dr. Gregory and to related hospital charges in connection with the surgery which he had performed.

A third bill was from St. Joseph's Memorial Hospital in Murphysboro, for physical therapy on Horn's left leg

for 10 to 30 days on or about November 2, 1977.

The remaining bill was from the Semmes-Murphey Clinic in Memphis, Tennessee, where Horn had been sent for a neurological consultation in connection with his back and leg. The bill is dated June 6, 1978, and bears the notation that it was 60 days past due, so that the consultation would have taken place around April 6.

Treadwell testified that the first bill which he recalled receiving was one sent by Dr. Gregory for a "penile prosthesis," and that he had received the bill on May 4, 1977. The two bills admitted in evidence which related to the surgery performed by Dr. Gregory were dated August 8, 1977, and May 31, 1978. Neither one uses the term "penile prosthesis," so that the bill referred to by Treadwell must have been an earlier one. Treadwell had not understood the meaning of the term, and when Horn happened to come into the office a few days later "on another matter," Treadwell testified, he showed Horn the bill and asked him for a layman's explanation of the procedure, which Horn supplied. Treadwell then told Horn that the respondent would not pay the bill.

The respondent's first contention is that the prosthesis was not reasonably required to cure or relieve from the effects of the accident of December 23, 1971. This effort to restrict Horn's claim to the expenses of the prosthesis disregards, of course, the fact that only two of the bills for which payment was sought concerned the prosthesis. The bills from the Semmes-Murphey Clinic and from St. Joseph's Memorial Hospital, according to Horn's uncontroverted testimony, were each for teatment of Horn's injured back and leg.

More importantly, the respondent's thesis represents a restrictive reading of section 8(a) unwarranted by the decisions of this court. The causal connection between Horn's original injuries, on the one hand, and both his incontinence and his impotence, on the other, was testi-

fied to by the respondent's witness, Dr. Gregory. Commenting on the fact that Horn had had both a bladder problem and had experienced impotence, the witness stated:

"Well, I thought that was of extreme significance, because from the history that Mr. Horn gave as to the initiation of this difficulty that he had following a back trauma, the correlation between neurogenic bladder disease, the inability of the bladder to empty in the normal fashion, and impotency are very often seen together, so that I would expect to see the two."

Dr. Gregory went on to state:

"I don't believe that the bladder condition affects the erection, or that the erection affects the bladder condition. I would think that a common primary problem would bring about both of those."

In his report of March 17 Dr. Roulhac also stated, "I do not think there is any doubt but that the sex problems he has had are related to his back injury."

The respondent argues, however, that the treatment of Horn's impotence was not, in the language of section 8(a), "reasonably required to cure or relieve from the effects of the accidental injury," since its cure could not undo the multiple fractures to his pelvis. Such a restrictive reading of section 8(a) was rejected as long ago as *W. J. Newman Co. v. Industrial Com.* (1933), 353 Ill. 190. It was held in *Newman* that a claimant who had suffered a fractured spine and paralysis of the legs from the hip down and had received an award for permanent total disability was entitled to be compensated for treatment needed to cope with further consequences of those injuries. The court stated: "A workman who is cured is, of course, relieved from the effects of his injury, but one who is incurable, as in the present case, may still need skillful attention to relieve him of pain or other injurious effects caused by his injury." 353 Ill. 190, 194. See also *Florczak v. Industrial Com.* (1942), 381 Ill. 120, 126-27; *Efengee Electrical*

*Supply Co. v. Industrial Com.* (1967), 36 Ill. 2d 450, 452-53.

The respondent next urges that Horn incurred the costs of obtaining the prosthesis without notice to or authority from the respondent, and thus must be regarded as having elected to secure these services at his own expense. Here again the respondent has given an incorrect and an unduly restrictive reading to section 8(a).

In view of Treadwell's testimony denying any advance notice of Horn's desire for treatment of his impotence, and since Horn did not testify to the contrary, it must be conceded that no advance notice or request was shown to have been given. That consideration is not dispositive, however, for an employer may still be held liable if he was "in possession of facts from which he might reasonably be presumed to know or to believe that such services were necessary." *City of Chicago v. Industrial Com.* (1959), 18 Ill. 2d 132, 136-37; *cf. Quaker Oats Co. v. Industrial Com.* (1953), 414 Ill. 326, 337-39; *Keystone Steel & Wire Co. v. Industrial Com.* (1978), 72 Ill. 2d 474, 484-85.

The report of Dr. Roulhac of March 1978, to the admission of which the respondent, as noted above, did not object, marks this case as one in which the respondent was aware of facts that would put it on notice that Horn might require additional medical services following the award. That report, which was directed to the respondent and to Dr. William Thornburg, presumably associated with the respondent, states:

> "Allen Horn comes up here today for re-evaluation. [The report then describes the medical referals and the treatment for impotence.] His complaint today is that he has not so much pain as numbness in his left foot, lateral calf and also on the right side. He has a little pain from time to time in his left hip but he does not stress this and obviously moves around with greater ease than before. He was seen by Dr. Otto's group in Cape who referred him to the Memphis neurosurgeons who saw him and referred him back to me."

After further discussion of the present condition of Horn's spine and leg, Dr. Roulhac went on to suggest the possibility that Horn might be developing a spinal stenosis. He stated that he advised Horn that if that hypothesis should be confirmed, the writer might "consider doing a decompression laminectomy in the lumbar region."

The respondent's witness Treadwell was asked a few questions on cross-examination in an unsuccessful attempt to ascertain what role was played by the respondent in Dr. Roulhac's examination of Horn. Treadwell stated that he had not arranged for the examination, and that he did not know who had. He also stated that he did not know if Horn had been examined or treated by Dr. Roulhac at any time prior to March 1978. He admitted, however, that in some cases the respondent had referred claimants to Dr. Roulhac, and he stopped short of testifying that the respondent had not instituted a program of examining Horn from time to time to ascertain the condition of his back and leg.

The record does not show that Dr. Roulhac submitted a bill to Horn, and the Commission could legitimately infer from that fact, from the report's statement that Horn had come up for "re-evaluation," from the range and extent of the report, and from the guarded testimony of Treadwell, that Dr. Roulhac was acting on behalf of the respondent and had not been engaged by Horn as his personal physician.

It seems unlikely that Horn would not have informed the medical personnel retained by the respondent who were examining him of his concern over impotence prior to his having seen Dr. Gregory. We are struck, too, by the apparent inconsistency between Treadwell's willingness to authorize payment for the medical services rendered by Dr. Palagiri, as to which the testimony also fails to show any advance notice or request, and Treadwell's later refusal to assume liability for Dr. Gregory's services.

The respondent's continuing contact with and examination of Horn sets this case apart from *City of Chicago v. Industrial Com.* (1959), 18 Ill. 2d 132, and *Board of Trustees v. Industrial Com.* (1978), 71 Ill. 2d 287, in each of which an allowance of medical expenses was set aside. In the first of these cases the claimant, after treatment by his employer for broken ribs and other injuries incurred when he was run over, had been released by the employer's physician and told to return to work. The claimant did not do so. Instead, since he still felt pain in his chest, he entered a different hospital on his own initiative and without his employer's knowledge. He was diagnosed as having tuberculosis, and subsequently parts of one lung were removed.

In the second case cited above, the claimant, who was employed as a construction laborer, suffered a back injury which was diagnosed as requiring only conservative treatment. He was discharged from the hospital as requiring no further treatment but with the treating physician's recommendation that he obtain a lighter type of work. This the claimant did, but with a different employer. Upon a recurrence of pain in his back he consulted a doctor of his own choosing, who determined that he had suffered a herniated disc and performed a lumbar laminectomy.

The respondent also objects on two grounds to the admission of the medical bills. The first ground is that the bills were not properly "authenticated," since they did not disclose the identity of the physician, the nature of the service rendered, and the date of treatment. The bills which were introduced in evidence were not those originally sent to Horn, and consequently they omitted some information which would have been contained in the original bills. The testimony of Horn and Dr. Gregory did supply the material facts, however, and if the respondent desired further details it could have made inquiry of these witnesses. See *Corn Products Refining Co. v. Industrial*

*Com.* (1949), 402 Ill. 250, 252.

The second ground of objection is that no showing was made that the charges billed were reasonable. It may be, as suggested in *Wicks v. Cuneo-Henneberry Co.* (1925), 319 Ill. 344, 348-49, cited by the respondent, that since Horn had not paid any of the charges in question, the respondent should not have been ordered to pay them without evidence that they were usual and customary. The only point made here, however, is that the bills for that reason ought not to have been admitted. The respondent has waived that point by failing to urge it before the Commission.

For the reasons given, the judgment of the circuit court is accordingly affirmed.

*Judgment affirmed.*

MR. JUSTICE CLARK, dissenting:

I am constrained to dissent for two reasons. First, the majority has misapplied section 8(a) as it existed in 1971. The claimant personally obtained medical services and the respondent should not be compelled to pay for them. Second, the majority has made assumptions which are not only unsupported by the evidence but also do not lead to the conclusions the majority has drawn.

As the majority correctly points out, the law in effect at the pertinent time stated that an employee who elected "to secure his own physician, surgeon and hospital services," without notice to his employer, so elected at his own expense (Ill. Rev. Stat. 1971, ch. 48, par. 138.8(a)). We clearly explained the requirements in *Health & Hospital Governing Com. v. Industrial Com.* (1978), 72 Ill. 2d 263, 272-73:

"Under the law as it stands without the amendment, an employee may recover medical expenses for personally obtained services if the treatment is necessary and the employer was aware of such

treatment. (*Bell & Gossett Co. v. Industrial Com.* (1972), 53 Ill. 2d 144, 150-51; *Barricks Corp. v. Industrial Com.* (1969), 44 Ill. 2d 9, 14; *Quaker Oats Co. v. Industrial Com.* (1953), 414 Ill. 326, 338.) The employee must make a claim upon the employer for medical services, and the claim must be sufficient to apprise the employer of the employee's desire for treatment and to allow the employer the opportunity to provide such treatment. (*Barricks Corp. v. Industrial Com.* (1969), 44 Ill. 2d 9, 14; *American Distilling Co. v. Industrial Com.* (1968), 40 Ill. 2d 350, 352.) Where the employee justifiably concludes that the employer has disclaimed responsibility for medical care and seeks treatment elsewhere, that will not be deemed a decision to 'elect to secure his own physician, surgeon and hospital services at his own expense' (Ill. Rev. Stat. 1973, ch. 48, par. 138.8(a)) within the meaning of the Act. *Barricks Corp. v. Industrial Com.* (1969), 44 Ill. 2d 9, 14; *Jewel Tea Co. v. Industrial Com.* (1968), 39 Ill. 2d 180, 183-84."

While it is true that the claimant sent the bills to the respondent *after* medical services had been rendered, that could hardly be deemed to be compliance with the statute. The crucial point is that the claimant did not make a claim for medical services prior to obtaining them in 1977, and he did not afford the respondent any opportunity to provide such treatment. Furthermore, since he did not make a claim upon the respondent, the claimant could not possibly be justified in concluding that the respondent disclaimed responsibility for his medical care. Moreover, since the claimant's injury occurred in 1971 and he was not employed by the respondent when, six years later, he sought medical services, it is difficult to understand how any knowledge by the employer could be inferred. Therefore, the claimant made the election to seek his own

medical services and must bear the cost himself.

I also disagree with the unsupported conclusions the majority draws from the evidence. The majority misunderstands a significant fact in discussing Dr. Roulhac's report. The majority finds that the Commission could infer— from the facts that the record contains no bill from Dr. Roulhac and that the report spoke of "re-evaluation" of the claimant, and from the range and extent of the report and the "guarded" testimony of respondent's manager of workmen's compensation—that Dr. Roulhac was acting on behalf of the respondent and had not been engaged by Horn as his personal physician.

I am unclear whether the majority discusses Dr. Roulhac's role in the case because it assumes either that Dr. Roulhac somehow acted as a representative of the respondent or that Dr. Roulhac's participation in the case was due somehow to a connection to Dr. Gregory. In either event, there is no evidence to support such an assumption.

First of all, it is a puzzle how the fact that no bill to any person from Dr. Roulhac was admitted into evidence signifies that Dr. Roulhac acted on behalf of respondent. Also, the fact that Dr. Roulhac speaks of re-evaluation of the claimant in his March 17, 1978, report does not establish in any clear or logical manner the inference that the respondent was privy to a prior evaluation or that a prior evaluation, if any existed, took place before the claimant's surgery in April 1977. Next, the range and extent of the report merely indicate that, as of the late date of March 1978, the respondent had obtained knowledge of the insertion of a penile prosthesis. It is *advance* notice (which is conceded not to have existed (81 Ill. 2d at 342)), which is required by section 8(a), not notice of the need for medical services 11 months after they have been rendered. Finally, the majority speaks of Treadwell's "guarded testimony." The majority states: "Treadwell was

asked a few questions on cross-examination in an unsuccessful attempt to ascertain what role was played by the respondent in Dr. Roulhac's examination of Horn. Treadwell stated that he had not arranged for the examination, and that he did not know who had. *** [H]e stopped short of testifying [*i.e.*, he did not testify] that the respondent had not instituted a program of examining Horn" periodically to determine the condition of his back and leg. (81 Ill. 2d at 343.) It seems to me that to say Treadwell's testimony was guarded is somewhat of an exaggeration. In reality, Treadwell merely testified that the respondent had no advance notice of claimant's need for medical services in 1977, that he did not order an examination by Dr. Roulhac in 1978, and that he did not know who might have, although the respondent did sometimes refer patients to Dr. Roulhac; finally, Treadwell did not state that the respondent had not re-examined the claimant periodically concerning his back and leg. How any of the foregoing negative factors—or, more properly, inferential leaps—can lead one to the conclusion that Dr. Roulhac acted on behalf of the respondent is beyond my comprehension. Also, even assuming Dr. Roulhac did act for the respondent, his report, even if "re-evaluative," in no way indicates that the respondent had notice prior to April 1977, when the surgery was performed.

In short, there is no explanation from the majority as to how Dr. Roulhac's knowledge, even if one accepts the inplausible conclusion that it is imputable to the respondent, reflected in a report written 11 months after the claimant's surgery, is able to support the inference that the respondent knew of the surgery prior to its transpiring. Such a conclusion is especially difficult to accept since the opinion *concedes* that the respondent had no advance knowledge of the surgery. (81 Ill. 2d at 342.) This central contradiction compels me to dissent.